655-774-ABDALA v. the Immigration and Naturalization Service. Each side has 20 minutes. Good morning. Good morning, Your Honors. Jason Serf, Federal Defenders, on behalf of Mr. Abdala, the appellant in this matter. The issue presented and pending before Your Honors is whether Mr. Abdala's removal from Somalia violated 8 U.S.C. 1231b-2's removal provisions because of the lack of a functioning central government in Somalia at the time of his removal, even prior to that and through to today. And because of the lack of a functioning central government, whether the violation stems from Where is Mr. Abdala today? He's somewhere in Somalia, Your Honor. And he's been there for how long? He was removed in 2000. But he's been there for seven years. Correct. This case has been pending for quite some time. And the question obviously is whether or not Somalia can qualify as a country as contemplated by 1231b-2's provisions. Do I understand correctly? Excuse me, Judge Wardlaw. Go ahead. Well, I think we're probably going to the same question. I think what we have to address first is whether or not the district court had jurisdiction of this habeas petition following Mr. Abdala's deportation and whether we have jurisdiction. I believe the Court does have jurisdiction. I think there are a few reasons. One, and I've discussed this in my papers, the Court in violation of law. There's no question the Court in the past has held that it has jurisdiction and continuing jurisdiction. And in what way was Mr. Abdala removed in violation of law? He was removed to a destination that didn't qualify as a country under 1231b-2. But do I understand correctly he didn't raise that until after he had already been deported? I attempted. That is correct. Well, the situation in the district court was as follows. I got notice from Mr. Abdala that he was going to be removed. I intended and did file a leave of court to file an amended petition along with a request for a temporary restraining order before he left the country, all of which was denied. I asked for an opportunity to submit an emergency appeal and hold everything, and the Court denied that as well. What I did thereafter was, because Mr. Abdala had already left the country, I continued to seek leave to amend my petition, which the Court eventually granted some five years later, actually, holding that it continued, obviously, to still have jurisdiction. Do you have the date on which you sought a stay? I do, Your Honor. Was it the same judge the entire time? No. This was transferred to one of the new judges that was nominated and approved, I think, in 2004. So it just sat with the first judge? Who was the first judge? Judge Lorenz. Okay. It sat there for three years? More. It was filed originally in 2000. I think I am correct. In November of 2000, and I'm looking through the clerk's record here, prior to his removal, the warrant of removal was executed and filed on November 1st. I applied for a temporary restraining order. The reply from the government was filed for the TRO. The reply was filed October 18th, 2000, so my TRO application preceded that, and it appears it was around October 16th of 2000, Your Honor. Did I see Borey was deported? Yes. And now the amendment is where you allege that he was deported in violation of the law because Somalia is not a country. Correct. That was the second issue. There were two issues raised. The first one was resolved by JAMA, and that was whether or not they could remove without advanced consent. And then the second issue was whether or not Somalia qualified as a country as required by the statute. Now, that was an amendment. Now, does that amendment relate back to the date of filing of the original case? It should. I don't know. Under Rule 15? In violation of T. No, under Rule 15. Oh, under Rule 15. Off the top of my head, I don't know, Your Honor. I would argue that it obviously should for purposes of due process and fairness. I believe Mr. Abdallah should have the rights. I mean, there's a rule about that, right? When you file an amendment, there's a relation back. I believe there is, and it is. I'm not too familiar with Rule 15. I haven't read it in quite a while, to be honest. But in 2254, I'm familiar with the relation back after amendments have been made, so I would agree that if that happens in 2254, which are still governed by the same rules of civil procedure, it should be the same situation here in 2241. I just don't understand how you can complain about him being deported to Somalia after he's already been deported to Somalia. Well, I think that the case law from this Court makes it pretty clear that under Singh and Mendez that there is a continuing argument to be made even after deportation if the deportation occurred in violation of law. I mean, if your grounds for complaining about it after he'd been deported was that he was entitled to asylum or he had something else that goes to the merits of his deportation, I can understand that. But when you complain about the destination after he's already there, I just don't see how we can make that work. Well, we sought to preclude it, so I think the first filing occurred prior to his physical removal, so I think he should be given the benefit of that filing. But didn't your first filing only challenge the fact of his lengthy detention? That was the initial filing that I believe was lodged with the Court in September of 2000, and it was a few weeks after that that we filed. But your complaint was you're holding him too long, you've got to let him out. Correct. And INS responds by deporting him. Correct. And then after that, you seek to amend the complaint to add a different provision. Well, I filed an amended petition prior to his removal, which the Court denied, along with a TRO, which the Court denied. And it wasn't until after his removal that the Court denied it. I thought you filed your motion to amend the petition on November 20th. That was October 20th? November 20th. Correct. That was November 20th when I sought leave to amend because the Court had denied my TRO. Right. But once you lose the TRO, you haven't amended the complaint, right? I understand that you sought a TRO, which the Court denied. Correct. But the only complaint before the Court at that time was that he was being detained by INS for too long in this country. Correct. And that's all that the Court had. Correct. And it's not until later on, after he's already out of the United States, that you try to amend the complaint to add a different charge, which is that he can't be deported to Somalia. Correct. At that point, he was already in Somalia. Well, I didn't argue that he couldn't be deported. I think the argument was that the deportation occurred in violation of law. He was already deported, and it's a question of whether or not the deportation complied with the statutory requirements at 1231b2. I don't think there's much of a distinction, with all due respect, between Singh and Mendez and what the issue is here. I certainly think rules of fairness would entitle Mr. Abdallah to seek review of whether or not his deportation was lawful, because under the reasoning in those cases, if the deportation isn't lawful, doesn't comport with due process, technically, based on this Court's decisions, he's still in custody of immigration. If you hadn't raised the question of the unlawfulness of deporting somebody, including perhaps everybody, to Somalia, until after he was already deported to Somalia, how was INS supposed to know that it was deporting him in violation of law? You hadn't raised the issue at that point. Correct.  And INS should know what the law is, but it doesn't take, you know, a complaint to tell INS what the law is. But just to follow up on Judge Bidey's question, what relief – this is related to Moodness, the jurisdictional question. What relief are you seeking from Mr. Abdallah? What relief could this Court possibly grant him at this point? I think this Court can do the same thing it had done in Singh and Mendez, and that is order immigration to allow him to return to the United States and resume the same custodial status he had prior to his unlawful removal. And the case would continue from there, and he'd be able to file anything by way of habeas to challenge his detention at that time. Yes, so you'd still have two claims, right? Correct. You'd have – if he were to be brought back here, he'd be put in detention, right? Correct. So you'd still have the unreasonable detention. Correct. And because it's our position that the detention continues in light of the unlawful removal, he's well beyond the 180-day statutory removal period discussed in Zedvitis. So he'd have a very ripe claim, to say the least, when he came back into custody. So, okay, so the relief you want is to have – because if you succeed in your claim, that's not a country. Relief you want is to – but I don't know if – could this court issue such an order to order him back? It didn't sing in Walters, and I believe the order by the court was that it allowed him to return to the United States to seek relief before the appropriate immigration judge in that case because he had been in immigration proceedings still. Are you in touch with him? No, I have lost contact with him, unfortunately. So if you – how does he know that he can come back? Published three weeks in the Somali Times or – I mean, what do we do? Obviously not presuming he'd violate the law and come back, but if he were ever to come back, obviously there would be collateral consequences, and that certainly would be the first way he'd find out about the court's decision would be that technically he didn't violate the law because he's returning. But to be honest, Your Honor, I don't know how he would find out, but I don't know if that necessarily means this court can't or shouldn't grant the relief I'm to the contrary. I think it becomes a very significant question not only for Mr. Abdallah but others in his position, and not just for Somalis at this point. I think it's a question that's going to arise more and more often with the court. I was thinking about that because I was wondering, would you say Iraq isn't a country because it doesn't have a functioning central government? Well, it has a central government in place that sits in Iraq and governs. The question is, how effective is it? Well, it's recognized. It has authority. It has troops on the ground. The U.S. is assisting it, obviously, and it's enforcing the law, and for the most part, the population is obeying the law. It's the rebel factions and these outbreak groups and offshoots of al-Qaeda that are the ones not respecting the law and the government that's in place. It's not even an interim government at this point. It's a full-fledged government from my understanding. That's quite different from what we would have in Somalia at this time. We don't even have, I believe, an interim government. Nothing has control within the country there. It's still controlled by warring factions and warlords, and even the Immigration Service has admitted in JAMA there is no functioning central government. The country reports issued by CIA and DHS all indicate that it's an area where the population isn't controlled by any sort of government there, which is why I think it's a distinct difference from the situation in Iraq. In Iraq, it's just these small populous individuals of rebelling factions. In Somalia, on the other hand, DHS and CIA have characterized it as an entire country that's unlawful and that nobody in the population respects any sort of law because there is no law. There's no branch or part of government there to enforce the law. It's warring. I don't think there's any question. There's certainly no question in my mind that Somalia is a very unpleasant place to that is absolutely chaotic there and that this would be sort of a disastrous place for anybody, including a native Somalian, to be returned to. But by the very fact that we can refer to Somalia and that when I say Somalia, you understand exactly what territory I'm referring to, it's not like we deported Abdullah to the Persian Empire or that we sent him to Prussia, which are now boundaries that are now lost. We understand exactly where he is when we said Somalia because we understand where the territory is. And that seems to be sort of the broader sense of what a country is in the statute is that it refers to a particular territory, a particular place or land. Well, that I think is half the definition of what country is. It is, Your Honor is correct, a territory. But as the Supreme Court's made clear in Burnett and Mensovich, it's not only a territory, but it's a territory with a sovereign government, a sovereign power in place that has control and authority and can administer the law over that territory. Your Honor, I'm sure, is thinking of the government citation of the case Smith, which is the Federal Tort Claim Act case involving Antarctica. Antarctica is a territory, and the Supreme Court in there said territory can be a country. But the Supreme Court made very clear in that case that the term country had a variety of different definitions. And when determining what the proper definition of country is in a statute, you have to consider it in relation to the context of the legislation. And in that case, they considered Antarctica to be a country, but then went on to discuss in the context of the Federal Tort Claim Act whether or not that was the only requirement. And had they believed that country could simply be a piece of territory, there would not have been any need for the Court to go any further in its discussion. And it went on to say that it wouldn't make any sense to say otherwise, but not because of the definition, but it was because of these jurisdictional issues and venue issues that arose in that case. Counsel, if we were to get to the point, if we were to get to the merits here and get to the point where we had to decide whether Somalia was a country, how could we do that in light of the political question doctrine? How could we do that without treading on Congress and the President's powers? I don't think this is a question of – it's not a political question. It's a question of statutory interpretation. That's really the issue here. How do you get it out of the statute that we could find that Somalia is not a country? Because I don't find anything – there isn't anything in there about a functioning government, is there? There's nothing in the definition. No, but it refers to government in the definition itself. In one of the definitions, but not the one that's relevant for your case, I believe. Well, I think there's adequate case law for the Court to rely on here. Even though there's no definition in the statute and nothing defined in the legislative history. Where are the ordinary rules of statutory interpretation? You take a look at the statute and you determine what Congress intended. Well, no, that's not where you start. First you look to see whether it's a plain language. And have you looked at what Black's Law Dictionary says about the definition of country? Usually lawyers look at that definition and use it as the ordinary. I think I have, Your Honor, yes. Well, it defines it as a nation or a political state, the territory of such a nation or state. Why shouldn't we just imbue it with that ordinary meaning? Well, if you give it that meaning, Your Honor, then I still believe Mr. Abdallah should win and prevail because we think of a nation and a state. And Mensovich and, in particular, Burnett make it clear that a state has to have a government, a sovereign controlling regime in place over the nation. So I don't think it matters whether or not you begin with the Black's Law Dictionary definition of country. You have to say what's the plain meaning of country. Correct. And so usually it's typical that you just look at the dictionary definition to find the ordinary. And when you're talking about a legal term, you look at the legal dictionary. I agree with you, Your Honor. It's a starting point. But Mensovich and Burnett both make clear that's not the end point. You still have to consider the context of the legislation to determine whether the plain meaning makes sense and gives intention to what Congress wanted the law to do. And I think stopping at the simple definition from the dictionary doesn't adequately undertake that analysis. And if you undertake the analysis here and you take a look at the statute, the statute in several places refers to government of the removal country whenever it elaborates on removal. And it does this in a variety of different areas within 1231B. For the court to sit here and rule that it doesn't need a government, it just can be a piece of territory, that reads effectively out of the statute any reference to a government by Congress in the statute. And the court has to give meaning to every word in the statute. That's what Congress wanted. And it clearly indicated government when it referred to country. How do they physically remove him to Somalia? Can you go to LAX and catch a flight to Somalia? How do they physically do that? They put him on something called JPATS, which is a marshal service. They drugged him in this case, didn't they? Yes. So how do they do it? They, I believe, took him from LAX, from San Diego to LAX, LAX, I believe, to Kennedy. And then from Kennedy they flew him to Europe. I believe it was Amsterdam. I can't recall exactly. It's been so long since I reviewed that particular set of facts. This is a marshal's plane? It was a marshal's plane, correct. All the way? No, actually, that's what one of the issues was in the case. It was they flew him to a third nation and then put him on a commercial jet from that nation into Somalia. And did they have to get Somalia's authority to receive him? Well, that's what JAMA said they didn't have to do. They didn't have to get consent. I mean, as a practical matter, do they have to get a visa? Can anybody just fly to Somalia? I don't think they got a visa because there's no government to give one. So I'm assuming they, I know they just removed him without a visa. And what the government proffered to the district court in the proceeding here was that before it got on a plane, somebody asked if he was a citizen of Somalia, I believe, and that was sufficient according to the government to allow him to embark from that third nation back to Somalia. Someone authorized him somewhere along the line to enter Somalia? A flight attendant. There's no evidence in the record it was a government official, and I don't think there is any government there to claim there are officials, especially in a third nation, authorizing entry. If he's in a third nation and not Somalia, there's no indication whatsoever that third nation speaks on the part of the Somali government and can give any sort of consent to a repatriation of a national. So they forced him on this commercial flight to Somalia. And he landed in Mogadishu. And then what? He called me panicked and was trying to find someplace safe to live. And I had communication with him for approximately, I believe, a year and a half to two years, and then I hadn't heard from him. Did you ever file anything with the judge to say, hey, you've got to decide this case while it was sitting there? I mean, I think there's letters you can send and things you can do. I was in contact with the law court, and the law court kept telling me things would be taken care of and the decision would be forthcoming. And we did continue to file updates with regard to the status of Somalia. We filed continuing updates with regard to the status of case law. I know the briefs in this case made it to Seattle, and then obviously this court had decided a leak quite a number of years ago. So there were cases coming out of the ninth dealing with this issue that we were providing to the court with regard to updates. And then eventually the government asked for a stay, pending the Supreme Court's decision in JAMA. How long did that stay last? I believe it lasted approximately 18 months. I'm not sure off the top of my head, but I think it was approximately a year and a half. A year to a year and a half, the stay was in place. Mr. Chief, did you want to reserve your remaining time? Please, Your Honor. Thank you very much. Good morning, Your Honor. Sam Bedwick for DHS. May it please the Court, on this jurisdictional question, I think this is something really I didn't notice until yesterday, and I did call Mr. Sir. It really needs to go back one more step. If you look at Excerpt of Records No. 6, which is the immigration judge's order, designated Somalia. The removal order itself designates Somalia, and there was no appeal to the BIA. So that hasn't been briefed, so I just want to raise that as an issue. What's the point of that? Well, the Court has ruled that when there's no appeal to the BIA, that there will be no review of the final order if the alien hasn't exhausted administrative remedies. And this was part of the removal order. This is a collateral proceeding. Pardon me? This is a collateral proceeding. All I'm saying is that under Real ID Act, if this is a challenge to the removal order, which apparently it is. This was filed before the Real ID Act. Correct. And under the Real ID Act, existing cases were supposed to be transferred from the district court to this court, and this court would consider it as a petition for review. And as a petition for review, the court would note that there was no appeal to the BIA and therefore a failure to exhaust administrative remedies. And don't you think that you may have waived all of these arguments since you've never brought them to our attention in any writing before? It's a jurisdictional question, Your Honor. That's all I'm just raising, and it's a jurisdictional question. Are you sure? I think so, Your Honor. I think the court has said so. But I'm just sorry that it is. You're just throwing this out for us. Pardon me? You're just throwing this out just for us to have one more thing to kind of independently research? I apologize. It's a jurisdictional question. I felt I should bring it to the court's attention. I told Mr. Sir last night that I just noted this in review of the file. It would have been nice if you would have notified us, given us some citations, authority. I apologize. What do you do about Mr. Sir's point that, you know, if he shouldn't have been deported, he shouldn't have been deported there and doesn't render the case moot and he's entitled to whatever relief he can get? I'm sorry. There might be several issues contained in that. Pick whichever one you like. Well, I think the court hasn't asked him about Teague and the fact that he didn't address that at all, never cited it, and that was the district court's basis for its decision. That was why the district court said it was mootness is because, under Teague, if there's no remedy available because it wasn't unlawful at the time, then the case is moot. Now, maybe the district court was wrong, but there was never any challenge to that decision by the district court. He appealed it. What do you mean there was no challenge? He appealed it. There's nothing in the opening brief, Your Honor. Teague isn't even cited in the opening brief. Because that paragraph that you're referring to in the district, that is in the opening brief, but the way the petitioner interprets that is that the court dismissed the case as moot and miscited Teague because, obviously, Teague doesn't stand for mootness. Well, then I would invite the petitioner to say what basis of mootness the court was referring to because that's the only one I could think of that was referring to. It was moot because there's no remedy given the fact that it's not retroactive. There is a remedy. He says the remedy is we can declare the deportation invalid, and if he can figure out how to get back to the United States, more power to him. Your Honor, well, okay, I guess I kind of have an open door. I think one thing I want to mention about JAMA is that I think JAMA, even though there is that footnote that says they're not deciding this issue about whether Somalia is a country, JAMA does provide guidance in this case. It does say that there shouldn't be absolute rules, that there should be deference to the president on matters of foreign affairs, especially where Congress has not provided any clear definition. It's all in the JAMA case. I think it's all there. Actually, what JAMA says, actually, it purports, I agree with you, it purports not to decide that question, but it does say even without advanced consultation, a country with a functioning government may well accept a removed alien when he is presented at the border or port of entry. The absence of advanced consent is hardly synonymous with impracticability or impossibility. So JAMA, the Supreme Court seems to assume that the country would have a functioning government. Even though it says it's not deciding that, it does use that language. That's page 345. I thought that the sentence started with even if. In other words, it was a hypothetical. Even without advanced consultation. That's why they're saying that you don't have to get advanced consent, right? That's their holding? Right. Okay. So they say even if you don't have advanced consent, a country with a functioning government may accept them when they're presented at the border or the port of entry. So they're qualifying the term country as one with a functioning. Right. So they're saying, I guess, there are countries that don't have functioning governments. I suppose that's one way to read it. Or central. I should say functioning central government, and that seems to be the key word that Appellant is relying on, not that whether there's a government or any governing going on. Is there any governing? It's whether it's central. Is there any governing going on? Well, apparently so. Apparently there are at least three separate governing factions in Somalia. There is some self-governing going on. There are defined territories. It hasn't been taken over by another country. I think, you know, eight million Somalis who live there consider themselves Somalis, and they live in a country called Somalia. But I would just stress, though, I think JAMA does say that there should be no absolute rules in these kinds of cases. And as I said, especially where Congress has provided no definition, it says has not clearly set forth a definition, and there is none on what a country is. Your Honor, I have nothing more. Thank you, Your Honor. Thank you, Mr. Bentley. Mr. Sir? The only thing I guess I'd point out here with regard to the issue raised by the government under the Mootness v. Teague issue is there's a very large difference between the two principles, and I certainly agree with the court's indication at the district court. Deny this is Moot because it couldn't retroactively apply relief. I think that's very clear in the small paragraph that I refer to and that Judge Wardlaw has cited earlier. So the mere fact that there's no appeal from the immigration judge's order, likewise, I don't think that precludes any jurisdiction here. This isn't an issue that arose during the course of any immigration proceeding. The order of deportation had already become final, and it was a question of removability and whether the effectuation of the immigration judge's order was lawful. So I don't think there's any issue with regard to exhaustion. Couldn't it have been raised before the IJ? Well, the presumption is there wouldn't be a removal to a place that isn't a country by definition. If they say we want to deport this guy to Somalia, isn't that the time to say, hey, hey, you can't deport me to Somalia? Well, whether or not he knew the status, I know he was unrepresented by a lawyer at the immigration proceeding, so I don't think he said that. I know he didn't say that, as a matter of fact. He didn't raise it. But, again, it's not a question of whether or not the judge can simply say you're ordered removed to Somalia. It's a question of whether DHS can later physically remove him under 1231 pursuant to the order. There are orders of removal today ordering people removed to countries like the Soviet Union because that's what their citizenship was when they left, but we know the Soviet Union no longer exists. It's a Russian republic now, and those people can't be deported, but the immigration judges still ordered them deported there. That's what they put on the orders. So I don't think the designation by an IJ, in this case of Somalia as a destination, somehow precludes Mr. Abdallah because he didn't appeal that order from now seeking relief in a habeas petition before the court. I also don't think this is an issue that requires any sort of deference to BIA or to the executive branch's interpretation. There are no regulations at issue here. This isn't a question of some sort of CFR at issue. It's a question of a federal statute, and this court plainly has jurisdiction to decide that, and there's no Chevron deference required at all. So Mr. Abdallah certainly wasn't required, I don't think, to challenge it or appeal it. What about this last-minute thing that he threw up today about we should be treating this as a petition for review? Oh, absolutely not. I agree with Your Honor. He never raised that below. It's waived. I also don't think, like I said, this isn't a question of him challenging the immigration judge's oral order and written order. It's a question of whether or not the DHS, a separate agency within the executive branch of government, lawfully enforced that order. And that's the issue here. It's not a question of whether or not the IJ made a wrong decision or a right decision. It's whether or not DHS or legacy INS made an improper judgment call when it deported them to Somalia because it wasn't a country. So I don't think it should be construed as a petition for review at all in that sense. If we were to grant, if we were to afford you the relief that you've requested, that would mean that every Somali who had been sent back to Somalia by the United States for some period of at least seven years would be entitled to come back into the United States, doesn't it? That would be the case, yes. Because all of them would have been deported in violation of law. Correct. Do we have any idea how many people that is? I've represented about 600 of the individuals from 1999 to 2003 in my office, and I think I maybe had somewhere around five or less, and all of them with the exception of Mr. Abdallah, from what I recall, were released from custody. The other attorneys in my office at this point who are continuing the program, and I talk with them regularly and actually prepared me for the oral argument today with the MOOT, they said that there are Somali clients we currently represent. I know this is out of the record, and I can certainly submit supplemental briefing, but there are Somalis that are being released from immigration detention either on bond or without bonds. Because they can't keep them for more than the 90 days. The 180 days, correct. The 180 days, and then Zabitis comes into play. If we were to get to the question of whether Somalia is a country, do we need to send it back to the district court to conduct a hearing on this question? No, I think this court can decide it. It can simply decide it. I think this court should. What facts would we have to know in order to be able to decide that? That there's no country. That it lacks a functioning government, and how would we know when that period had ended? Was Mr. Abdullah carrying a Somali passport? I don't believe he had a passport. How about your other clients? I don't know. I'm sure when they escaped Somalia, I can't speak for all of them because my memory is not good. I'm just curious as to whether anybody still has a Somali passport. I don't know. Maybe government counsel would be in a better position than I to answer that. He sees these more often. Do you think that we have all the tools in the record to be able to decide that Somalia is not a country? Absolutely. I cite a plethora of materials that I cited to the district court, indicating from CIA, from DHS. Most of it suggests that it's a failed state. What do you do with a list in counsel's brief of all of the international organizations, including the United Nations, that continue to list Somalia on its list of countries? Recognition is different than being a country. Recognition is separate and distinct from functioning as a country as contemplated by 1231. I indicated in my reply brief that many of the citations relied on by the government were from the pre-1991 days, before the government that had run Somalia was basically overthrown in a violent coup and no longer was in power. And if you look at those websites, many of them date back to the 50s and 60s, before the government was overthrown and while the government was actually in place. And a lot of the seats in those committees and those organizations are vacant. They call them observers as opposed to members. But I do think it's a little bit misleading to claim all these organizations have them as a member, but it's a throwback to pre-1991 days, and I don't think it's dispositive. And I certainly think the government's briefs in JAMA make it very clear that they were conceding there was no functioning central government there. I don't think it can be any clearer. I don't think I cited even maybe a quarter of their assertions that there was no functioning central government, but I think they've spoken to that issue quite clearly, and it's very recent, and there's nothing since that time that's come up indicating otherwise. So I do think there's plenty in the record here for the court to go on to make that decision that there was no functioning central government, and as a result it couldn't qualify as a country as 1231 contemplated. So how many places besides Somalia and Antarctica would be touched by that rule? Wow. I feel like I'm in history class. I know. I'm trying to figure that out myself. I think you made a good point on Iraq. I agree. Iraq purports to have a central functioning government. Right. Afghanistan now does. Maybe prior to the Taliban being ousted, arguably that could have been an issue for the court. Palestinian territories, do they qualify? I've had Palestinian clients who were actually deported to Jordan because there was no Palestinian territory. Technically, it's part of Israel. We had a case last month involving Gaza. Would that qualify? It's a functioning government in Gaza. It oversees the Gaza. I really can't give you a detailed answer, but at first blush it might, but I think it certainly could be if it's considered part of a larger state of Israel and maybe being a smaller territory within that state possibly could fit that definition. But this is a question that certainly I don't want to see evaded review because it's something very prevalent and something I think that's timely. It does seem a little arbitrary that some Somalians are being released from detention because the government recognizes that they can't just drop people off in Somalia and then others are being dropped off in Somalia. I mean, what makes the difference? I don't know. I wish I knew that answer, and I wish I knew why Mr. Abdallah had been targeted to be removed not only in violation of law but against his will at the very least between being drugged not only here. Could he have designated another place? He could have, but the immigration judge's order doesn't indicate that he did. Mr. Abdallah was ordered deported because he had been convicted of a crime. Is that correct? I believe so, yes. And what was the crime? He was convicted of unlawfully taking a vehicle and a conspiracy to destroy government property. For the latter, he received 364 days custody for the taking of a vehicle, 181 days time served, and three years probation. So it potentially looks like that was a misdemeanor. The conspiracy to destroy government property, that actually is how we discovered the indefinite detainee situation in Southern California. And it was actually a riot at the facility, and that's what he was convicted of. A riot at the detention facility? Yes, in 1999. And that's how we discovered the group of indefinite detainees, which numbered more than 100 at that time just in the Southern District alone. And Mr. Abdallah was one of those men who were not deportable and had been in custody for quite some time. And he entered immigration custody November 2, 1999, so it was almost a full year before I filed the initial habeas petition. If there's anything else, I'll submit, Your Honors. We're going to the fighting. Thank you, gentlemen. Mr. Sir, I especially want to thank you for what you're doing on behalf of an absent client. Very much. Thank you. 0556061, page versus the State of California. Each side will have 20 minutes.
judges: Silverman, Wardlaw, Bybee